# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

APR 30 2007

OFFICE U.S. DIST. COURT

BY:

DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:06cr00062 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DAMIEN ANTONIO MURPHY, | ) | By: GLEN M. WILLIAMS |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

This matter is before the court on a pro se Motion to Set Aside Verdict, (Docket Item No. 142), ("Pro Se Motion"), filed by the defendant, Damien Antonio Murphy, as well as a Motion for Judgment of Acquittal, (Docket Item No. 146), ("Motion for Acquittal"), and a Motion to Vacate and Set Aside Verdict and Grant New Trial, (Docket Item No. 147), ("Motion for New Trial"), which were filed by the defendant's counsel.[1] Based upon a review of the motions filed on behalf of Murphy,

---

[1] On January 30, 2007, an order was entered that allowed Augustus Benton Chafin Jr., Esquire, to withdraw as counsel for the defendant. (Docket Item No. 98.) The defendant was permitted to proceed pro se at trial, but Mr. Chafin was required to attend trial on a standby basis to assist the defendant. (Docket Item No. 98.) After proceeding pro se at trial, the defendant subsequently filed a Motion to Appoint Counsel. (Docket Item No. 137.) On March 2, 2007, Mr. Chafin was again appointed as counsel for the defendant. (Docket Item No. 141.)

It should also be noted that Nancy Dickenson, Esquire, was the defendant's first-appointed counsel. Ms. Dickenson was first appointed as defense counsel on September 21, 2006. However, on December 6, 2006, Ms. Dickenson filed a motion to withdraw as counsel, citing difficulties that had arisen within the course of representation, based upon the defendant's objection to a motion to continue filed by Ms. Dickenson. However, Ms. Dickenson indicated that the defendant actually agreed to the motion to continue. Events surrounding Ms.

-1-

and for the reasons set forth below, I will deny the motions.

## I. Facts

In this case, Murphy, along with his co-defendants, Marsha Arlene Massengill and James Anthony McCord, was charged in a multiple-count indictment with conspiracy to possess with the intent to distribute cocaine, cocaine base and hydromorphone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846, and possession and concealment of forged and counterfeited obligations and other securities of the United States with intent to defraud, in violation of 18 U.S.C. § 472. (Docket Item No. 21.) The charges in this case resulted from a traffic stop on June 6, 2006, in Wythe County, Virginia. Following the arrests and resulting charges, on November 20, 2006, Murphy filed a motion to suppress evidence seized during the initial arrest. (Docket Item No. 43), ("Motion to Suppress"). Murphy argued that the items seized were the result of an unlawful search and seizure of his person, the automobile, a duffle bag located inside the car and of his cellular telephone. (Motion to Suppress at 1.)

On November 27, 2006, Virginia State Trooper Danny Pruett testified at a suppression hearing before The Honorable Pamela Meade Sargent, United States Magistrate Judge. Prior to the arrest in question in this case, Massengill was driving a Chevrolet Impala in which Murphy was traveling in the front passenger seat and McCord was traveling as a passenger in the back seat. At the hearing, Trooper Pruett

---

Dickenson's representation, as well as the motion continue, will be addressed when discussing the defendant's Pro Se Motion.

testified that he was operating stationary radar on Interstate 81 northbound when his radar unit indicated that Massengill's vehicle was traveling 95 miles per hour in a 65-mile per hour zone. Trooper Pruett stopped the vehicle at approximately 6:35 a.m., and asked Massengill to present her driver's license and vehicle registration. Massengill informed Trooper Pruett that her name was Debbie Arlene Sanchez and also provided a date of birth. She told Trooper Pruett that she had left her driver's license at home. Massengill also provided a Hertz rental agreement which indicated that Sabrina Calloway was the authorized driver of the vehicle.

At that point, Trooper Pruett asked Murphy for his driver's license, however, Murphy stated that he had also left his license at home. Trooper Pruett then asked if anyone within the vehicle had a driver's license, to which McCord responded affirmatively. McCord presented what appeared to be an Alabama driver's license that was issued in the name of Clarence Todd Drain and indicated a date of birth of April 26, 1978. Trooper Pruett then took Massengill to his patrol car, leaving Murphy and McCord in the rental car. Upon returning to his patrol car, Trooper Pruett checked the name Debbie Arlene Sanchez in the National Crime Information Center, ("NCIC"), database to determine whether an individual by that name had a valid driver's license. No response was received, which indicated that no license or state identification card had been issued to a person with that name and date of birth. At this time, Massengill informed Trooper Pruett that the passenger in the front seat was Cory Murphy, who had asked her to travel to New York with him to visit his ill grandmother. She claimed that she knew the back seat passenger only as "James." Trooper Pruett testified that Massengill was visibly nervous and that she hesitated before she answered his questions.

-3-

Trooper Pruett also testified that he checked the license produced by McCord in the NCIC. The check revealed that no license or state identification card had been issued to a person with the given name and date of birth. However, the check did reveal that the driver's license number belonged to a female in Alabama. Shortly thereafter, Trooper Pruett requested assistance because he realized that no one on the scene was legally permitted to drive the vehicle; thus, he stated that it had to be impounded and fully searched. Upon confrontation, McCord admitted that the driver's license he presented was fraudulent. Trooper Pruett then arrested McCord for possession of a fictitious driver's license. Upon the arrest, Pruett searched a green duffle bag that McCord claimed belonged to him. Inside the duffle bag, Trooper Pruett found a fragment of a glass pipe, a handheld dagger-type weapon and a powdery substance, which McCord said was baking soda.

Trooper Pruett then approached Murphy, who identified himself as Cory Antonio Murphy and stated that his date of birth was September 24, 1977. A check of the NCIC database revealed that no driver's license or state identification card had been issued to an individual with that name and date of birth. Murphy stated that Sabrina Calloway, the invidual to whom the rental car was leased, was his girlfriend. Trooper Pruett asked Murphy whether there were any illegal items in the vehicle, and Murphy said there were not. Murphy then refused to allow Trooper Pruett to search the vehicle.

Massengill was placed under arrest for reckless driving and having no operator's license. Trooper Pruett then searched Massengill's purse and found a Jefferson County inmate identification card in the name of Marsha Massengill with

-4-

a date of birth of October 8, 1980. At that time, she admitted that her true name was Marsha Massengill, and she informed Trooper Pruett that she was wanted in Alabama on forgery charges. This information was confirmed when Trooper Pruett ran the information in the NCIC database.

Shortly thereafter, Murphy was placed under arrest for obstruction of justice because he presented false information to the officer. Once all three were under arrest, a search of the trunk of the rental car revealed a duffle bag with make-up and female clothing, as well as a small laptop briefcase containing a grocery bag with more than $14,000 in United States currency. At that time, all three were advised of their *Miranda*[2] rights. Murphy claimed that the money in the briefcase was his, and that he planned to use the money to purchase clothing and shoes so that he could open a clothing business. He explained that he had earned the money from a lawn care business and had withdrawn it from a bank account, but Murphy had no documentation to support his claim. A yellow t-shirt, containing 26 sheets of what appeared to be counterfeit United States currency was retrieved from the glove box of the rental car. Trooper Pruett testified that Murphy said the counterfeit money was his and that he was unaware that it was in the vehicle. Murphy later indicated that when Trooper Pruett took Massengill to his patrol car, McCord had handed Murphy the t-shirt and told him to place it in the glove box. Trooper Pruett also testified that a drug dog later alerted on the $14,000 in currency, which indicated the presence of illegal drugs.

Murphy, McCord and Massengill were transported to the Wythe County

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Sheriff's Department. Trooper Pruett explained that, while being fingerprinted, Murphy told him that he wanted to speak to him. Murphy then stated that he had lied about his identity because he was on parole for various drug convictions and that he was not supposed to be outside of the state of Alabama without permission from his parole officer. He informed Trooper Pruett that his real name was Damien Antonio Murphy and that his date of birth was June 17, 1976. Murphy was searched at the police station, but nothing was found. However, when McCord was searched, a plastic bag that contained two smaller bags, one of which contained what appeared to be crack cocaine, and one of which contained what appeared to be powder cocaine, were retrieved from the waistband of his underwear. The green duffle bag was further searched and a business card with the name of J. McCord was retrieved. A check of this name in the NCIC database revealed that J. McCord was wanted for distribution of narcotics in Alabama. Alabama authorities were asked to send a photograph of J. McCord to the Wythe County Sheriff's Department, and the picture matched the appearance of the back seat passenger.

On November 28, 2006, based upon the evidence presented at the suppression hearing, and the arguments of counsel, Magistrate Judge Sargent recommended that the court deny the motion to suppress. (Docket Item No. 48), ("Report"). In her Report, Magistrate Judge Sargent found that probable cause existed for Murphy's arrest, that the cell phone yielded from the search of Murphy's person was incident to his lawful arrest and should not be suppressed, that the inventory search of the vehicle was lawful and the items yielded from the search should not be suppressed. (Report at 9.) On December 20, 2006, the undersigned entered an order adopting the Magistrate Judge's report and recommendations. (Docket Item No. 71.)

The case proceeded to trial as to Murphy on February 12, 2006, while Massengill and McCord entered into plea agreements with the Government and agreed testify against Murphy. At trial, Trooper Pruett testified and reiterated his account of the traffic stop and investigation.

McCord was called to testify and acknowledged that he had entered into a plea agreement with the Government. However, he indicated that he was not certain of the charges against him. McCord admitted to being a drug addict for approximately 20 years, and that he primarily abused crack cocaine. After McCord identified Murphy in the courtroom, he testified that he had purchased crack cocaine from Murphy more than "10 to 20 times." He also explained that Murphy would sometimes "front" him the cocaine, i.e. provide it to him on credit. McCord testified that he often delivered drugs for Murphy, but he was unable to identify specific names of people who allegedly purchased drugs from Murphy. McCord was then asked to describe the purpose of the trip with Murphy and Massengill. McCord indicated that they were traveling to New York City to purchase pills. McCord stated that they had planned to meet an acquaintance of his named "Unc" who would provide the drugs in exchange for money. He said that he called "Unc" to set up the drug deal, which was to be paid for with Murphy's money. McCord explained that he had traveled to New York City with Murphy on more than one prior occasion to purchase drugs.

McCord further testified that the sheet of what appeared to be counterfeit currency was indeed counterfeit. He stated that Murphy made the counterfeit bills and that he had previously helped Murphy make counterfeit bills. McCord testified that he had sprayed a substance on the counterfeit bills after they were printed that

-7-

made the texture more like an actual bill. Moreover, he claimed that he had actually witnessed Murphy use a laptop and printer to produce the counterfeit currency. McCord testified that, when their vehicle was stopped by Trooper Pruett, he attempted to hide the counterfeit bills, but, instead, he handed them to Murphy. In addition, McCord explained that Murphy had made the false driver's license that McCord presented to Trooper Pruett.

McCord stated that a pipe and some baking soda were recovered from his belongings. He explained that the baking soda was used to mix with cocaine and to brush his teeth. When questioned about the arrest, McCord estimated that the roadside stop lasted for approximately two hours. After the arrests were made, McCord testified that they were transported to the police station where Murphy removed a baggy of cocaine from his pants and threw it at him. McCord stated that after Murphy threw the illegal drugs to him, he placed them in the waistband of his pants and asked to use the bathroom. Trooper Pruett then searched McCord and located the cocaine.

Massengill also was called to testify against Murphy. She acknowledged that she had entered into a plea agreement with the Government. She explained that it was Murphy's idea to go to New York City. However, she testified that Murphy had informed her that he had to go to a funeral in New York City and that he also planned to purchase clothing and books for the purpose of certain business ventures. Massengill stated that she had no plans to travel to New York City prior to leaving. She further testified that she observed a printer, scanner and laptop in Murphy's possession in Alabama. She admitted that she had previously possessed counterfeit

-8-

money, but she claimed that she was not sure how the counterfeit money was obtained or produced. Massengill explained that she was aware that Murphy and McCord had previously traveled to New York to purchase pills. Massengill indicated that she also was aware of the fact that Murphy distributed crack cocaine based upon general knowledge. Massengill testified that she had seen Murphy with cocaine on numerous occasions in the past. Although Massengill testified that Murphy had said his clients were experiencing symptoms of drug withdrawal from not getting pills, she never specifically stated that he distributed pills. Furthermore, Massengill stated that, prior to entering the police station following the arrests, she saw Murphy hand McCord a plastic bag that she assumed to be crack cocaine. Massengill testified that she witnessed Murphy reach into his pants to retrieve the illegal drugs.

Brian Sheppard of Birmingham, Alabama, also testified at trial against Murphy. Sheppard identified his cell phone number, which was stored in a cell phone seized from Murphy at the time of the arrest. The Government read several text messages sent from Sheppard to Murphy. The messages indicated that Sheppard was seeking drugs from Murphy . The messages also indicated that Sheppard had experienced drug withdrawal symptoms because of his need for the drugs Murphy provided to him. Sheppard further testified that, in the past, he had bought hydromorphone pills and crack cocaine from Murphy. He indicated that he had witnessed Murphy in possession of illegal drugs and that Murphy normally kept them in his pants, or waistband. On cross-examination, Sheppard admitted that he was a drug addict before he met Murphy. Sheppard also was asked how many people used his telephone during a typical day. Sheppard estimated that five to eight people probably used his phone throughout the course of an average day. He stated that anyone could

have used his phone on the days the text messages were sent, but he acknowledged that the texts messages referred to were sent by him. Sheppard testified that Murphy never personally informed him that he planned to go to New York, but Sheppard stated that he remembered that Murphy brought back several hats from New York.

During the trial, Murphy presented no witnesses. Murphy indicated that he had made a motion to subpoena 14 witnesses,[3] but that the court had only granted his request as to the officers involved in the traffic stop. Prior to trial, Murphy filed a motion and sought to subpoena Doug Tuck of the Wythe County Sheriff's Department; Keith Dunican of the Wythe County Sheriff's Department; Nancy Dickenson, his former attorney; Investigator Gina Humphrey; Magistrate Anthony L. Rowletts, a Mrs. Nelson; Sergeant Nelson; Sergeant Steve; Sergeant Golden; Lieutenant Murphy; Elizabeth Stokes, a courtroom deputy for the United States District Court for the Western District of Virginia, Abingdon Division; Attorney Max Jenkins; and Virginia State Trooper, Chris Chapman. (Docket Item No. 102.) On February 2, 2007, Magistrate Judge Sargent entered an Order which granted in part and denied in part Murphy's motion to subpoena witnesses. (Docket Item No. 108.) The motion as to Doug Tuck, Keith Dunican and Trooper Chris Chapman was granted; however, Magistrate Judge Sargent denied Murphy's request as to the remaining witnesses because he had failed to show why the remaining witnesses' presence were needed for an adequate defense. (Docket Item No. 108.)    Then, on

---

[3] It should be noted that the names of the witnesses requested by Murphy are, for the most part, listed as they were in his pro se motions to subpoena. Some of the names were misspelled, referenced individuals by the wrong title or were simply incomplete, for example, the references to "Sergeant Steve," "Sergeant Golden," "Sergeant Nelson" and "Mrs. Nelson." The names of the requested witnesses were corrected to the extent possible.

-10-

February 6, 2007, Murphy filed another motion requesting subpoenas of the same witnesses, with additional requests which included Officer Underwood of the New River Valley Jail and Virginia State Trooper Danny Pruett. (Docket Item No. 110.) Magistrate Judge Sargent granted Murphy's motion as to Trooper Danny Pruett, but denied his motion as to the remaining witnesses because he failed to show the necessity of the remaining witnesses' presence for an adequate defense. (Docket Item No. 111.)

On February 13, 2007, the jury found Murphy guilty on all counts.

## II. Analysis

### A. Motion to Vacate and Set Aside Jury Verdict and Grant New Trial

On March 2, 2007, Murphy filed his Pro Se Motion which was entitled "Motion to Appeal Conviction," and was docketed by this court as a "Motion to Set Aside the Verdict." Murphy's court-appointed counsel subsequently filed a separate Motion for New Trial. Each motion will be discussed separately.

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, upon the defendant's motion, a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Whether to grant or deny a motion for new trial is within the broad discretion of the district court, which should be disturbed only in very limited circumstances. *See United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003); *United States v. Greene*, 834 F.2d 86, 88 (4th Cir.

-11-

1987). A district court "'should exercise its discretion to grant a new trial sparingly' and . . . should do so 'only when the evidence weighs heavily against the verdict.'" *Perry*, 335 F.3d at 320 (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)).

A Rule 33 motion may be brought based upon newly discovered evidence, or other grounds. The Fourth Circuit has developed a five-part test for evaluating motions for a new trial based upon newly-discovered evidence. In *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989), the court determined that a motion for a new trial should only be granted if: (1) the evidence is newly discovered; (2) the movant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues; and (5) the evidence would probably result in an acquittal at a new trial.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Murphy argues that the court should vacate and set aside the February 13, 2007, jury verdict which found him guilty. Murphy contends that he has identified newly discovered evidence, consisting of one or more witnesses, which were not called at trial, that would "provide a substantial defense" to him. Murphy simply alleges that the evidence is newly discovered evidence that would be beneficial to his case. However, nothing within Murphy's Motion for New Trial indicates whether or not due diligence was exercised in discovering the evidence. Likewise, the motion does not offer any information that tends to prove that the new evidence would likely result in an acquittal at a new trial. Because Murphy has merely provided conclusory statements without offering any evidence to substantiate them, this court is of the opinion that

-12-

he has failed provide a justifiable basis for a new trial.

As stated earlier, the district court has the authority to grant a new trial based upon newly discovered evidence, as well as other grounds. In addition to his argument as to newly discovered evidence, Murphy argues that a new trial is warranted because certain witnesses that he requested to be subpoenaed were not issued process by the court. Murphy claims that the testimony of these witnesses could have produced evidence at trial that would have "cast reasonable doubt . . . in the minds of the jury." (Motion for New Trial at 1.) On February 1, 2007, Murphy filed a pro se motion with this court requesting that several witnesses be subpoenaed to testify. (Docket Item No. 102.) This court entered an Order dated February 2, 2007, which granted Murphy's motion as to Doug Tuck and Keith Dunican of the Wythe County Sheriff's Department, and Trooper Chris Chapman of the Virginia State Police. (Docket Item No. 108.) However, the remaining requests were denied without prejudice because Murphy failed to show the "necessity of the remaining witnesses' presence for an adequate defense." (Docket Item No. 108.) Then, on February 6, 2007, Murphy filed another pro se motion requesting that certain witnesses be subpoenaed. (Docket Item No. 110.) He explained that he did not want to reveal his strategy by explaining why each witness was needed. (Docket Item No. 110.) Following the additional request for the subpoena of witnesses, this court entered an Order granting Murphy's motion as to Trooper Danny Pruett of the Virginia State Police. (Docket Item No. 111.) The remaining requests were once again denied without prejudice because Murphy did not demonstrate why each witness was needed at trial. (Docket Item No. 111.)

The Orders entered by this court clearly informed Murphy as to why his subpoena requests were denied. Each order denied the requests without prejudice, so as to give Murphy the opportunity to present information to demonstrate the necessity of the requested witnesses' presence for an adequate defense. Because Murphy did not comply with this court's Orders and provide adequate grounds for the issuance of the requested subpoenas, he has failed to present grounds upon which a new trial can be granted.

Additionally, in Murphy's Pro Se Motion, he asserts numerous arguments as to why the verdict should be set aside. Murphy essentially argues that the Government failed to produce sufficient evidence to establish that he participated in the conspiracy for which he was convicted. Specifically, Murphy claims that "mere knowledge" of a conspiracy is insufficient to establish that a party contributed in the furtherance of the conspiracy, and that it must be proven that he knew of the conspiracy, purposefully associated with it and affirmatively cooperated in the objective of the conspiracy.

In general, to prove conspiracy to distribute cocaine, crack cocaine or hydromorphone, the Government was required to show that two or more persons entered into an agreement to distribute the illegal drugs or to possess the illegal drugs with the intent to distribute. *See United States v. Wilson*, 135 F.3d 291, 306 (4th Cir. 1998). In addition, the Government was required to demonstrate that the defendant knew the purposes of the agreement and deliberately joined the agreement. *Wilson*, 135 F.3d at 306.

Case 1:06-cr-00062-JPJ-RSB   Document 157   Filed 04/30/07   Page 14 of 25   Pageid#: 486

In this case, evidence was presented by two Government witnesses that Murphy and McCord entered into a plan to travel to New York to purchase hydromorphone, with the intent to transport the drugs to Alabama to sell. At trial, McCord plainly stated that the purpose of the trip to New York was to purchase hydromorphone pills. McCord testified that, pursuant to the plan, he and Murphy were to meet an acquaintance of his named "Unc," to purchase the illegal drugs with Murphy's money. McCord also testified that he and Murphy had traveled to New York on prior occasions for the purpose of purchasing hydromorphone pills. In addition, McCord explained that he routinely purchased drugs from Murphy and stated that he also had delivered drugs for Murphy several times.

In further support of the conspiracy, Massengill also testified that Murphy and McCord had traveled to New York in the past to purchase hydromorphone pills. Moreover, Massengill testified that she was aware of Murphy's illegal drug activity by virtue of general knowledge and because of the number of phone calls he received. She indicated that Murphy had informed her that several of his clients would become sick due to drug withdrawal when they could not obtain drugs from him. One of those clients, Brian Sheppard, testified that he had purchased hydromorphone pills and crack cocaine from Murphy. He also stated that he sent several text messages to Murphy in which he explained that he needed drugs and had experienced withdrawals. Therefore, this court is of the opinion that the Government presented enough evidence to justify the jury's guilty verdict.

Murphy also argues that he did not possess the counterfeit money recovered from the vehicle. In order to establish a violation of 18 U.S.C. § 472, the Government

-15-

must prove the following elements: (1) that the defendant possessed the counterfeit money; (2) that, at the time of possession, he knew the contraband was counterfeit; and (3) that he possessed the contraband with the intent to defraud. *United States v. Leftenant*, 341 F.3d 338, 347 (4th Cir. 2003).

Thus, to be convicted of this charge, the Government was required to prove that Murphy was in possession of the counterfeit currency. Possession may be either actual possession or constructive possession. Constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control of the item. *United States v. Laughman*, 618 F.2d 1067, 1076-77 (4th Cir. 1980); *see also United States v. Ocampo*, 2007 U.S. App. LEXIS 6155 (4th Cir. May 16, 2007). Therefore, constructive possession is demonstrated by ownership, dominion or control over the forged and counterfeited currency. In this case, Murphy was traveling within the car in which the counterfeit currency was recovered. Additionally, McCord testified that, when the vehicle was stopped, he handed the counterfeit currency to Murphy. Thus, it was reasonable for a jury to find that Murphy was in possession of the counterfeit currency because he was traveling in a vehicle with the contraband, which demonstrated that he exhibited dominion and control over the counterfeit currency.

Proof of the second and third elements may be shown by direct or circumstantial evidence. *Leftenant*, 341 F.3d at 347. In this case, McCord testified that he had assisted Murphy in the production of counterfeit currency in the past. McCord stated that he had sprayed a substance on the counterfeit bills after they were printed that essentially made the texture of the paper more like an actual bill.

-16-

Furthermore, both Massengill and McCord indicated that Murphy possessed the equipment to produce counterfeit currency, i.e. laptop, printer and scanner. McCord explained that Murphy made the false driver's license that McCord presented to Trooper Pruett, which further indicated that Murphy had previously made fraudulent items. Also, because McCord indicated he had helped Murphy produce counterfeit currency in the past, McCord's testimony tends to show that Murphy knew that the currency was fraudulent. Lastly, because the evidence presented at trial tends to show that Murphy knew the currency was counterfeit, that Murphy produced the counterfeit currency and that Murphy and McCord had taken steps to make the currency appear more realistic, it is an obvious conclusion that he possessed the contraband with the intent to defraud. Hence, the jury was justified in rendering a guilty verdict as to this charge.

Murphy also claims that his right to a speedy trial was violated by virtue of his counsel's filing of a motion to continue that he is claims he did not agree to; as such, Murphy contends that he did not waive his right to a speedy trial. However, in *United States v. Conway*, 471 F. Supp.2d 665, 666-67, (W.D. Va. 2007), Judge Moon ruled that a defendant cannot, at any time, waive limitations imposed by the Speedy Trial Act. In essence, the Speedy Trial Act of 1974 governs the time allowed between arrest and indictment, and between indictment, or initial appearance, and trial. *See* 18 U.S.C. § 3161 *et seq.* The underlying reasoning of the Speedy Trial Act is that both the public and the defendant have the right to ensure that criminal trials are quickly resolved. *See Conway*, 471 F. Supp.2d at 666. Thus, it would be unreasonable for the criminal defendant alone to be free to waive these rights because the interest in having a speedy trial is held by the public as well. *Conway*, 471 F.

Supp.2d at 666; *see also United States v. Keith*, 42 F.3d 234, 238 (4th Cir. 1994).

On December 1, 2006, Murphy's counsel, who at this time was Nancy Dickenson, filed a motion to continue in order "to have ample time to review the discovery disclosures and conduct an investigation into the events surrounding the case and adequately prepare for trial." (Docket Item No. 50), ("Motion to Continue" at 1.) In the Motion to Continue, counsel noted that Murphy had been advised of his right to a speedy trial and that "[h]e concurred that, in the interests of justice, a brief continuance would be appropriate." (Motion to Continue at 1.) Counsel further explained that failure to grant the continuance would "deny counsel the reasonable time necessary for effective preparation." (Motion to Continue at 2.)

Shortly thereafter, Ms. Dickenson filed a motion to withdraw as attorney, (Docket Item No. 52), ("Motion to Withdraw"). In a brief in support of the Motion to Withdraw, she explained that Murphy wished to terminate the attorney/client relationship and that representation had become increasingly difficult. (Docket Item No. 53), ("Brief in Support of Motion to Withdraw"). Ms. Dickenson also noted that Murphy was "belligerent and hostile" apparently because of the Motion to Continue that was filed, even though he had initially agreed to the motion on November 27, 2006. (Brief in Support of Motion to Withdraw at 3.) On December 7, 2006, the court granted the Motion to Withdraw as Attorney. (Docket Item No. 59.) The next day, on December 8, 2006, the court appointed Mr. Chafin as new defense counsel for Murphy; however, on December 12, 2006, Mr. Chafin filed a Motion to Withdraw as Attorney. (Docket Item No. 62.) Then, on December 14, 2006, this court granted a continuance as to Murphy's co-defendants, despite Murphy's objections. (Docket

-18-

Item No. 67), ("Order to Continue").  The court found that "the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendants under 18 U.S.C. § 3161(h)(8)(B)(iv)."  (Order to Continue at 1.)  The court justified its finding based on the fact that Murphy's newly appointed counsel would not have had reasonable time to effectively prepare for trial, in addition to the fact that Murphy's newly appointed counsel had moved to withdraw from the case because of Murphy's lack of cooperation.  (Order to Continue at 1.)  Moreover, counsel for Murphy's co-defendant's had expressed the need for additional time to investigate the charges against their clients.  (Order to Continue at 1.)

    Based upon the evidence before the court, Murphy was advised of his right to a speedy trial by Ms. Dickenson, his first-appointed counsel, and agreed to the filing of a continuance.  However, for some reason, Murphy later objected to the continuance he had previously agreed to, and sought to terminate the attorney/client relationship.  Murphy was appointed new counsel, only to have his new counsel file a Motion to Withdraw as Attorney just days before the jury trial was scheduled to take place.  Thus, in order to allow counsel adequate time to investigate and prepare for the case, this court was justified in continuing the matter despite Murphy's contention that he did not wish to waive his right to a speedy trial.  This court correctly considered the facts unique to this case, and determined that the ends of justice served by granting the continuance outweighed the best interest of the public and the defendant because the newly appointed counsel needed reasonable time to effectively prepare.  *See* 18 U.S.C. § 3161(h)(8)(A), (B)(iv).  Therefore, Murphy's right to a speedy trial was not violated, as the periods of delay arising from the continuance were properly excluded from the computation of when the trial was

required to commence.

Murphy argues that the indictment against him was duplicitous because it referenced three different drugs. He claimed that this interfered with his right to notice of the charges against him and would hinder his ability to plead double jeopardy in subsequent prosecutions. However, post conviction challenges to the sufficiency of an indictment are rarely successful. *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802 (1989); *United States v. McDonald*, 61 F.3d 248, 252-53 (4th Cir. 1995). The Fourth Circuit has ruled that "[t]o pass constitutional muster, an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998). Here, the indictment against Murphy was not insufficient, as it specifically alleged that on or about June 6, 2006, in the Western District of Virginia and elsewhere, Murphy, along with his co-defendants, conspired to possess cocaine, crack cocaine and hydromorphone, with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c) and 846. (Docket Item No. 21). Rule 7(c)(1) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). In this case, the indictment explicitly referenced the criminal violations alleged against Murphy, and essentially tracked the necessary statutory language, enabling him to be notified of the specific charges against him. Thus, the indictment against Murphy was sufficient.

Murphy also made several arguments referencing sentencing and that his initial

-20-

arrest was illegal. These arguments are without merit, as neither issue is currently before the court. Murphy's sentencing is scheduled for May 29, 2007, with this court. Thus, there is nothing for the court to address with regards to sentencing. Likewise, Murphy insists upon challenging the legality of the initial arrest; however, Magistrate Judge Sargent entered a Report determining that Murphy's arrest, and subsequent search and seizure, were lawful, which the undersigned adopted on December 20, 2006.

In sum, because the evidence presented at trial does not weigh heavily against the verdict, I am of the opinion that the interest of justice does not require that a new trial be granted. *See* FED. R. CRIM. P. 33(a); *Perry*, 335 F.3d at 320. Thus, the defendant's motions will be denied.

## B. *Motion for Judgment of Acquittal*

Rule 29(c) of the Federal Rules of Criminal Procedure allows a motion for a judgment of acquittal to be filed following the jury verdict or discharge. FED. R. CRIM. P. 29(c). Pursuant to Rule 29(c), if the jury has returned a verdict, "the court may set aside the verdict and enter an acquittal." FED. R. CRIM. P. 29(c). In ruling on a Rule 29 motion, the trial court should only consider the sufficiency of the evidence presented in that trial, not what evidence is likely to be admitted or excluded in a future trial. *United States v. Mackins*, 32 F.3d 134, 138-39 (4th Cir. 1994). Furthermore, neither the district court nor the appellate court should consider a witnesses' credibility, "but must assume that the jury resolved all contradictions in favor of the Government." *United States v. Romer*, 148 F.3d 359, 364 (4th Cir.

-21-

1998).

In his Motion for Acquittal, Murphy argues that the evidence presented in this case showed that the only drugs found in this case were in the possession of McCord; that the testimony of Massengill established that McCord was the sole individual in possession of the counterfeit currency; that the Government's evidence of conspiracy only pertained to an alleged conspiracy in Alabama, and not within the confines of the Western District of Virginia; and that no credible evidence showed that Murphy conspired to possess with the intent to distribute cocaine, crack and hydromorphone, or that he possessed counterfeit currency with the intent to defraud. Upon consideration of these arguments, I am of the opinion that the evidence presented at trial justified the jury verdict.

Murphy correctly points out that the crack cocaine discovered in this case was found on the person of McCord. However, testimony from both McCord and Massengill indicated that Murphy removed a plastic baggy containing crack cocaine from his pants and threw it in McCord's direction. Specifically, Massengill testified that she saw Murphy retrieve a plastic baggy, which she assumed contained crack cocaine, and give it to McCord. Likewise, McCord testified that, after Murphy threw the drugs toward him, McCord then placed the drugs in his waistband and asked to use the restroom. At that point, Trooper Pruett searched McCord and discovered the contraband. Therefore, based upon the testimony presented at trial, there is sufficient evidence to show that Murphy was in possession of crack cocaine at the time of the arrest.

-22-

Murphy also contends that he was not in possession of the counterfeit currency seized during the traffic stop. As stated earlier, the Government was required to prove that Murphy was in either actual or constructive possession of the counterfeit currency, and the Fourth Circuit has determined that constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control of the item. *See Laughman*, 618 F.2d at 1076-77; *see also Ocampo*, 2007 U.S. App. LEXIS 6155. Thus, constructive possession is demonstrated by ownership, dominion or control over the forged and counterfeited currency. The fact that the counterfeit currency was found within the car in which Murphy was traveling was sufficient for a jury to conclude that Murphy was in possession of the contraband. Furthermore, McCord's testimony indicated that he had helped Murphy produce counterfeit currency in the past and that he handed the currency to Murphy when the car was stopped. Thus, based upon the evidence presented at trial, this argument is without merit, as there was sufficient evidence to show that Murphy possessed the counterfeit currency.

Murphy asserts that the Government's evidence of a conspiracy showed that, if a conspiracy occurred at all, it occurred in Alabama and not the Western District of Virginia. Proof that a single overt act occurred in the charging district is sufficient to establish jurisdiction, even if the bulk of the conspiracy occurred elsewhere. *United States v. Gilliam*, 975 F.2d 1050 (4th Cir. 1992); *see also United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986). Therefore, even if, as Murphy contends, the alleged conspiracy truly occurred in Alabama, the Government must only prove that a single overt act occurred within the Western District of Virginia. In this case, the overt act of traveling to New York via the Western District of

-23-

Virginia to obtain illegal drugs, in addition to the fact that the defendants were in possession of counterfeit currency, crack cocaine and $14,000 in cash to purchase drugs is sufficient to confer jurisdiction upon this court. Thus, Murphy's argument is not well-taken.

Lastly, Murphy argues that there is no credible evidence to demonstrate that he committed the acts alleged in Counts One and Two of the indictment. Count One of the indictment alleged that Murphy was guilty of conspiring to possess cocaine, crack cocaine and hydromorphone with the intent to distribute. At trial, McCord testified that the purpose of their trip to New York was to purchase hydromorphone pills. He explained that he and Murphy intended to meet an acquaintance of his named "Unc," who would provide the illegal drugs in exchange for money. Furthermore, McCord stated that the drugs were to be purchased with Murphy's money. Moreover, McCord testified that he had traveled to New York with Murphy on more than one occasion to purchase drugs. McCord also provided testimony in which he explained that he had purchased drugs from Murphy and delivered drugs for Murphy on numerous occasions. Similarly, Massengill testified that she was aware that Murphy and McCord had previously traveled to New York to purchase hydromorphone pills. She also stated that she knew that Murphy distributed crack cocaine based upon incoming phone calls to Murphy and her general knowledge. At trial, Brian Sheppard testified that, in the past, he had purchased hydromorphone pills and crack cocaine from Murphy. He indicated that he had witnessed Murphy in possession of illegal drugs and that Murphy kept them in the waistband of his pants. Based upon the above-mentioned testimony, it is obvious that the Government presented significant evidence to demonstrate that Murphy conspired to possess

-24-

cocaine, crack cocaine and hydromorphone pills with the intent to distribute.

Count Two of the indictment alleged that Murphy possessed and concealed forged and counterfeited United States currency with the intent to defraud. As discussed in the previous section, significant evidence was presented that tended to prove that Murphy was in possession of counterfeit currency, knowing it to be counterfeit, with the intent to defraud. It could be argued that the testimony against Murphy as to Counts One and Two was not credible; however, this court is not to consider the credibility of the witnesses; instead, this court must assume that the jury resolved any contradictions in the Government's favor. *Romer*, 148 F.3d at 364. Here, the evidence presented at trial was sufficient to support the jury's verdict. Thus, the defendant's Motion for Acquittal will be denied.

### III. Conclusion

For the reasons stated above, I will deny the defendant's Pro Se Motion, as well as his Motion for New Trial and Motion for Judgment of Acquittal.

An appropriate order will be entered.

DATED: This *30th* of April, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE